96 F.3d 380
 65 USLW 2204, 24 Media L. Rep. 2576,
96 Cal. Daily Op. Serv. 6768,
96 Daily Journal D.A.R. 11,066
 Bryan H. CRAWFORD; Jim Atwell, a partnership doing business
as Advanced Publications; ISG Communications Inc., a
California Corporation; Bold Type, Inc., a California
Corporation; Wayne C. Berry, doing business as ZAP
Distributors; and Lisa Lascody, Plaintiffs-Appellants,
v.
Daniel E. LUNGREN, Attorney General, individually and as
Attorney General of the State of California; James K. Hahn,
individually and as City Attorney for the City of Los
Angeles; Willie Williams, Chief of Police, individually and
as Police Chief for the City of Los Angeles; Gilbert
Garcetti, District Attorney, individually and as District
Attorney of the County of Los Angeles; Thomas W. Sneddon,
District Attorney, individually and as District Attorney for
the County of Santa Barbara, Defendants-Appellees.
 No. 95-56570.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 11, 1996.
Decided Sept. 11, 1996.
 
 Stanley Fleishman, Fleishman, Fisher & Moest, Los Angeles, California, for plaintiffs-appellants.
 Christopher C. Foley, Deputy Attorney General, Los Angeles, California, for defendant-appellee Daniel E. Lungren, individually and as Attorney General of the State of California.
 Marjorie Heins, ACLU Foundation, New York City, and Cathy E. Crosson, Indiana University School of Law, Bloomington, Indiana, for amici Feminists for Free Expression and Californians Against Censorship Together.
 James V. Lacy, Laguna Niguel, California and Gary G. Kreep, Escondido, California, for amici Assemblyman Bill Morrow, the United States Justice Foundation, and Help Oppose Pornography and Exploitation.
 
 
 1
 Janet M. Larue, Santa Ana, California, for amici National Law Center for Children and Families, "Enough is Enough!" Campaign, National Coalition for the Protection of Children and Families, and Family Research Counsel.
 
 
 2
 Appeal from the United States District Court for the Central District of California, Manuel L. Real, District Judge, Presiding. D.C. No. CV-94-08343-MLR.
 
 
 3
 Before: FERNANDEZ and TASHIMA, Circuit Judges, and MERHIGE,* District Judge.
 
 
 4
 Opinion by Judge FERNANDEZ; Concurrence by Judge TASHIMA.
 
 FERNANDEZ, Circuit Judge:
 
 5
 Publishers, vendors, and one consumer of adult-oriented publications appeal the district court's order holding constitutional a California statute that bans the sale of "harmful matter" in unsupervised sidewalk vending machines. They contend that the statute is facially invalid because it discriminates against the sale of certain publications on the basis of content without being narrowly tailored to achieve a compelling state interest. We affirm.
 
 BACKGROUND
 
 6
 On January 1, 1995, California banned the sale of certain "harmful matter" in public vending machines. The statute, California Penal Code section 313.1(c)(2), provides:
 
 
 7
 Any person who knowingly displays, sells, or offers to sell in any coin-operated vending machine that is not supervised by an adult and that is located in a public place, other than a public place from which minors are excluded, any harmful matter, as defined in subdivision (a) of Section 313, shall be punished as specified in Section 313.4.
 
 
 8
 Section 313(a) defines "harmful matter" as:
 
 
 9
 matter, taken as a whole, which to the average person, applying contemporary statewide standards, appeals to the prurient interest, and is matter which, taken as a whole, depicts or describes in a patently offensive way sexual conduct and which, taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.
 
 
 10
 The statute also provides certain defenses to the crime described in 313.1(c)(2).[1] Penalties for violating the law are substantial, including a fine of not more than $2000 or imprisonment for as much as one year, or both for the first conviction. Cal.Penal Code § 313.4. Subsequent violations can lead to felony convictions. Id.
 
 
 11
 The constitutionality of the statute was challenged by Bryan Crawford and Jim Atwell, who operate a partnership known as Advanced Publications which produces The Sun; ISG Communications, Inc., which produces New Reality and Hollywood Playdates; Bold Type, Inc., which produces Spectator; Wayne Berry, who operates ZAP Distributors, a newsrack company; and Lisa Lascody, who is a consumer.[2] They requested injunctive and declaratory relief because, they claimed, the statute will likely make it commercially infeasible for the publishers to distribute their materials through vending machines, and the publishers have had great difficulty finding other outlets willing to distribute their materials.[3] Thus, they asserted, the law will ultimately interfere substantially with the ability of adults to purchase the periodicals, and substantially burden the publishers' ability to distribute their materials. That, they said, violates the First Amendment to the United States Constitution.
 
 
 12
 On December 19, 1994, the district court granted a temporary restraining order against the enforcement of the statute and an order to show cause why a preliminary injunction should not issue. Then, on January 6, 1995, the district court issued a preliminary injunction restraining enforcement of the statute pending trial.[4]
 
 
 13
 After trial, however, the district court concluded that the statute was not content-based and upheld it as constitutional. In finding the statute to be content-neutral, the court did not provide any explicit explanation, but did cite Young v. American Mini Theatres, Inc., 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), and City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). Those citations suggest that the court understood the statute to be content-neutral because it concluded that the statute regulated the material on the basis of its secondary effects, rather than on the basis of its impact on the reader. It then held that California had a compelling interest "in shielding minors from the influence of literature that is not obscene by adult standards," and that reasonable alternative means are available for distribution and receipt of the publications. In the alternative, it held that the statute satisfied the constitutional standards applicable to content-based regulations because it was narrowly tailored to serve a compelling state interest. Consequently, the district court dissolved the preliminary injunction and denied the prayer for a permanent injunction. This appeal followed.
 
 JURISDICTION and STANDARDS OF REVIEW
 
 14
 The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3). We have jurisdiction pursuant to 28 U.S.C. § 1291.
 
 
 15
 We review the district court's ruling on a challenge to the constitutionality of a state statute de novo. NCAA v. Miller, 10 F.3d 633, 637 (9th Cir.1993), cert. denied, 511 U.S. 1033, 114 S.Ct. 1543, 128 L.Ed.2d 195 (1994). We also review the decision to grant or deny declaratory relief de novo. Ablang v. Reno, 52 F.3d 801, 803 (9th Cir.1995) (" 'Although the decision to grant or deny declaratory relief ... is a matter initially committed to the discretion of the district court, on appeal we exercise our own 'sound discretion' to determine the propriety of the district court's grant or denial of declaratory relief.' ") (citation omitted) (quotation omitted), cert. denied, --- U.S. ----, 116 S.Ct. 701, 133 L.Ed.2d 658 (1996); see also Tashima v. Administrative Office of the United States Courts, 967 F.2d 1264, 1273 (9th Cir.1992); Fireman's Fund Ins. Co. v. Ignacio, 860 F.2d 353, 354 (9th Cir.1988) (per curiam).
 
 DISCUSSION
 I. First Amendment
 
 16
 Crawford contends that the statute violates the First Amendment right to free expression because it limits access to a forum based on the content of the message. In assessing the constitutionality of a regulation that limits the time, place, or manner of speech, we must determine whether the statute is content-neutral or content-based. See Tollis, Inc. v. San Bernardino County, 827 F.2d 1329, 1332 (9th Cir.1987). If the statute is content-based, we apply strict scrutiny to determine whether the statute is tailored to "serve a compelling state interest and is narrowly drawn to achieve that end." Simon & Schuster, Inc. v. New York Crime Victims Bd., 502 U.S. 105, 118, 112 S.Ct. 501, 509, 116 L.Ed.2d 476 (1991) (quotation omitted). If the statute is content-neutral, we must determine whether it "is designed to serve a substantial governmental interest and allows for reasonable alternative avenues of communication." City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 50, 106 S.Ct. 925, 930, 89 L.Ed.2d 29 (1986).
 
 1. Content-Based Regulation
 
 17
 The "principal inquiry" in determining whether a regulation is content-neutral or content-based "is whether the government has adopted [the] regulation ... because of [agreement or] disagreement with the message it conveys." Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622, ----, 114 S.Ct. 2445, 2459, 129 L.Ed.2d 497 (1994) (quotation omitted) (second alteration in original). "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content-based." Id. That perfectly defines the law at hand because it regulates on the basis of whether the content of a publication will be "harmful" to minors. To determine whether a particular publication is "harmful" under the statute, the state "must necessarily examine the content of the message that is conveyed," predict the "reaction" of young viewers, and make a judgment only on that basis. Forsyth County, Georgia v. The Nationalist Movement, 505 U.S. 123, 134, 112 S.Ct. 2395, 2403, 120 L.Ed.2d 101 (1992) (quotations omitted).
 
 
 18
 That the statute affects publications solely on the basis of content, however, is not quite the end of the inquiry. Some regulations which are seemingly content-based are analyzed as content-neutral regulations if the government shows that they are justified by a desire to eliminate a "secondary effect"--an undesirable effect only indirectly related to the content or communicative impact of the speech. See City of Renton, 475 U.S. at 47-49, 106 S.Ct. at 929-30.
 
 
 19
 The Supreme Court has defined secondary effects as being correlated with, but not directly a consequence of, the impact of the speech. See Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 2754, 105 L.Ed.2d 661 (1989) (in the area of sound amplification: "a regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others."); see also City of Renton, 475 U.S. at 48, 106 S.Ct. at 929 (some regulations of businesses that purvey sexually explicit materials are treated as content-neutral because they "are justified without reference to the content of the regulated speech"); cf. Forsyth County, 505 U.S. at 133-34, 112 S.Ct. at 2403 (regulation based on reaction to speech is not content-neutral). The Court has given examples of legitimate secondary effects, including "prevention of crime, maintenance of property values, and protection of residential neighborhoods." Boos v. Barry, 485 U.S. 312, 320, 108 S.Ct. 1157, 1163, 99 L.Ed.2d 333 (1988); see also City of Renton, 475 U.S. at 50-51, 106 S.Ct. at 930-31; Young, 427 U.S. at 71-72, 96 S.Ct. at 2453 (Stevens, J., writing for plurality); Tollis, 827 F.2d at 1332.
 
 
 20
 Section 313.1(c)(2), however, is not designed to remedy potential secondary effects of the "harmful matter." The statute is based only on the State's determination that reading the materials at issue will be "harmful" to minors. The statute, therefore, does not focus on the secondary impact of the speech, but rather on the direct impact of the speech on part of its potential audience. The statute is designed to prevent the materials from provoking harmful reactions in minor readers. That justification does not fall within the parameters of the secondary effects doctrine. As the Court has explained:
 
 
 21
 Regulations that focus on the direct impact of speech on its audience present a different situation. Listeners' reactions to speech are not the type of "secondary effects" we referred to in Renton. To take an example factually close to Renton, if the ordinance there was justified by the city's desire to prevent the psychological damage it felt was associated with viewing adult movies, then analysis of the measure as a content-based statute would have been appropriate.
 
 
 22
 Boos, 485 U.S. at 321, 108 S.Ct. at 1163-64. Like the hypothetical regulation described in Boos, section 313.1(c)(2) is concerned with psychological damage to readers and, therefore, "targets the direct impact of a particular category of speech, not a secondary feature that happens to be associated with that type of speech." Id.; see Berry v. City of Santa Barbara, 40 Cal.App.4th 1075, 1084, 47 Cal.Rptr.2d 661, 666-67 (1995) (ordinance that distinguishes between publications based solely upon whether they contain material deemed "harmful" to minors is content-based regulation subject to strict scrutiny because its purpose is not to mitigate secondary effects such as traffic congestion or loitering, but to mitigate the perceived effects of the contents of the publications on minor readers); Sebago, Inc. v. City of Alameda, 211 Cal.App.3d 1372, 1384, 259 Cal.Rptr. 918, 923 (1989) ("The second aim, that of restricting the access of minors to adult newspapers, concerns direct listener reaction to speech and is thus content-based."); see also City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 429-30, 113 S.Ct. 1505, 1517, 123 L.Ed.2d 99 (1993) (city cannot exclude newsracks just because they dispense commercial speech). Consequently, we must analyze this statute as a content-based regulation, but, as we will demonstrate, the statute survives strict scrutiny.
 
 2. Strict Scrutiny
 
 23
 Content-based regulations are presumptively unconstitutional. R.A.V. v. City of St. Paul, 505 U.S. 377, 382, 112 S.Ct. 2538, 2542, 120 L.Ed.2d 305 (1992). Nevertheless, a finding that a regulation is content-based does not foreclose the possibility that it is constitutional. See Simon & Schuster, 502 U.S. at 116-17, 112 S.Ct. at 508-09. "The Government may ... regulate the content of constitutionally protected speech in order to promote a compelling interest if it chooses the least restrictive means to further the articulated interest." Sable Communications of California, Inc. v. FCC, 492 U.S. 115, 126, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989); see also Simon & Schuster, 502 U.S. at 118, 112 S.Ct. at 509.
 
 
 24
 There is no dispute that the aim of the statute is to shield minors from the influence of adult-oriented literature by limiting minors' access to the publications. The Court has recognized that there is "a compelling interest in protecting the physical and psychological well-being of children" and that "[t]his interest extends to shielding minors from the influence of literature that is not obscene by adult standards." Sable Communications, 492 U.S. at 126, 109 S.Ct. at 2836; see also Denver Area Educ. Telecommunications Consortium, Inc. v. FCC, --- U.S. ----, ----, 116 S.Ct. 2374, 2391, 135 L.Ed.2d 888 (1996); New York v. Ferber, 458 U.S. 747, 756-58, 102 S.Ct. 3348, 3354-55, 73 L.Ed.2d 1113 (1982); Ginsberg v. New York, 390 U.S. 629, 639-40, 88 S.Ct. 1274, 1280-81, 20 L.Ed.2d 195 (1968). However, "[i]t is not enough to show that the Government's ends are compelling; the means must be carefully tailored to achieve those ends." Sable Communications, 492 U.S. at 126, 109 S.Ct. at 2837. To pass constitutional muster, content-based restrictions must be the least restrictive alternative available. They must be narrowly tailored to achieve that end. See Denver Area, --- U.S. at ----, 116 S.Ct. at 2391; Ward, 491 U.S. at 798 n. 6, 109 S.Ct. at 2758 n. 6 (distinguishing "least restrictive alternative" test of Boos from the less strict test for content-neutral regulations); Boos, 485 U.S. at 329, 108 S.Ct. at 1168; a content-based regulation was "not narrowly tailored; a less restrictive alternative is readily available," (citing Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 280 n. 6, 106 S.Ct. 1842, 1850 n. 6, 90 L.Ed.2d 260 (1986) (plurality opinion)).
 
 
 25
 Crawford asserts that the State has failed to show that the means used were the least restrictive. The resolution of that issue is made somewhat more difficult because, as Crawford points out, the California legislature did not make any specific findings. Crawford suggests that it must. We disagree. Although the courts have been less than pellucid when handling the narrowness issue, they have never said that the legislature must make findings. Findings, or evidence presented at trial, will be helpful and may even be a desideratum. Their absence can make it much more difficult to determine whether a proposed means is, or is not, the least restrictive. But even in the absence of findings or specific evidence, courts can and will rely on common sense, other statutes, and other cases when it becomes time to consider claims in this area.
 
 
 26
 We agree that if a plaintiff or the court can imagine and allude to other means, the state has the ultimate burden of showing that the means in question are not effective. See, e.g., Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293 n. 5, 104 S.Ct. 3065, 3069 n. 5, 82 L.Ed.2d 221 (1984) ("[I]t is common to place the burden upon the Government to justify impingements on First Amendment interests...."); see also 44 Liquormart, Inc. v. Rhode Island, --- U.S. ----, ----, 116 S.Ct. 1495, 1509, 134 L.Ed.2d 711 (1996) (in commercial speech area, the state bears the burden of showing that the regulation will advance its interest materially) (Stevens, J., writing for plurality); Rubin v. Coors Brewing Co., 514 U.S. 476, ----, 115 S.Ct. 1585, 1592, 131 L.Ed.2d 532 (1995) (same); cf. Thomas v. Review Bd. of Indiana Employment Sec. Div., 450 U.S. 707, 718, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981) (in unemployment benefit area, state must justify effect on religious liberty by showing that the means used were the least restrictive). But the courts have allowed discharge of that burden, or found a lack of discharge, in various ways.
 
 
 27
 In City of Renton, for example, the City had not relied upon studies that considered conditions within its borders. However, it had relied upon studies in another city which were summarized in another case. The Supreme Court found that to be sufficient. See 475 U.S. at 50-52, 106 S.Ct. at 930-31. And in Denver Area, the Supreme Court asked a number of questions testing the breadth of the statute in issue. The Court did not hold that the mere asking of the questions was enough to overturn the statute, but it did go on to strike the statutory provision because "the answers to the questions are not obvious." --- U.S. at ----, 116 S.Ct. at 2392. In that same case, the plaintiffs pointed out that a statute regulating a somewhat different area--unleased cable channels rather than leased ones--indicated that less restrictive means were probably available, and nothing in the record before the Court or Congress indicated that they were not. Id. at ---- - ----, 116 S.Ct. at 2392-93. Similarly, in Sable Communications, the Court did refer to Congressional findings and found that the findings did not support the statute. 492 U.S. at 129, 109 S.Ct. at 2838. However, the Court noted that the findings did not bind it anyway. Id. The Court also pointed out that other studies it had available satisfied it that the means were not the least restrictive. Id. at 28-30, 109 S.Ct. at 2838. Justice Scalia added that he agreed, but that this was a value judgment and that "neither due process nor the First Amendment requires legislation to be supported by committee reports, floor debates, or even consideration, but only by a vote." Id. at 133, 109 S.Ct. at 2840 (Scalia, J., concurring). As Justice Scalia suggested, common sense and other materials can lead judges to different conclusions. While legislative findings, evidence, and the like may help, the answers may differ. One need only read the fractionated opinions in Denver Area to be assured of that. There may be (nay, there is) a cosmic right answer, but it may be hidden from mere earthlings--even judges.
 
 
 28
 Of course, when past history and our common sense indicate that some particular exercise of First Amendment rights does not pose any particular danger, or that a restriction is inappropriate, we have required evidence to demonstrate the contrary. See, e.g., Wileman Bros. & Elliott, Inc. v. Espy, 58 F.3d 1367, 1378-79 (9th Cir.1995) (where there was no proof that forced generic advertising was more efficacious than private advertising, the forcing regulation was stricken), cert. granted, --- U.S. ----, 116 S.Ct. 1875, 135 L.Ed.2d 171 (1996); Cal-Almond, Inc. v. United States Dep't of Agric., 14 F.3d 429, 439-40 (9th Cir.1993) (same; also, where we could see no logical justification for certain restrictions and the evidence did not justify them, the regulations fell); Bay Area Peace Navy v. United States, 914 F.2d 1224, 1227-28 (9th Cir.1990) (even though least restrictive means not required, we could not see why the restriction in question was needed, so the absence of credible evidence meant that the restrictions must fall).
 
 
 29
 In the case at hand, the legislation on its face appears to be minimally restrictive if its ends are to be accomplished at all. In fact, it goes to great lengths to spell out ways that will keep children out of the materials in question, while still allowing access to adults. In fashioning the newsrack statute, California balanced the competing interests of protecting children from the harmful effects of consuming adult-oriented newspapers with the interest of adults in having access to those materials. Cf. Alliance for Community Media v. FCC, 56 F.3d 105, 124 (D.C.Cir.1995) (en banc), aff'd in part, rev'd in part, Denver Area, --- U.S. at ----, 116 S.Ct. at 2398. In order to achieve that balance, California had to mold a statute which would protect against the threat that children, without adult supervision, would purchase harmful materials from unattended newsracks. Yet, it could not preclude adults from obtaining the materials. The statute is effective in limiting children's exposure and has a narrow focus, which still allows adults to purchase the materials from alternative sources or in alternative ways. It tightly fits the State's compelling interest.
 
 
 30
 Given the unusually easy availability of materials in these unsupervised newsracks, we find it difficult to see how the State could have fashioned a statute that accomplished its goals while leaving the newsracks themselves untouched. No less burdensome means has been suggested which would still effectuate the goals for which the statute was designed. Crawford suggests the alternatives of placing warning labels on the newsracks, and banning the sale of adult-oriented newspapers within a reasonable distance from schools. Those solutions, however, would not succeed in eliminating or even addressing the State's concern that children will purchase harmful materials from unattended newsracks; there is no reason to think that those solutions would be even marginally effective ways of meeting the State's compelling interest.
 
 
 31
 Placing warning labels might deter some children, but would certainly not deter (and could even attract) the bulk of them. Although the State presented no evidence to that effect, we hardly think that evidence is required. A person who purchases from a newsrack is perfectly anonymous. It borders on the absurd to say that a youngster would be deterred by an announcement which said something like "[This publication] is highly explicit and is intended for adults over the age of 21 only." As a California Court of Appeal has said in a similar context, "This, of course, assumes ... that the minor will heed the warning. We cannot indulge this assumption." Berry, 40 Cal.App.4th at 1085, 47 Cal.Rptr.2d at 667.
 
 
 32
 Geographic restrictions are no more efficacious. Placing newspaper racks away from schools would at best force children to go somewhat out of their way to obtain illicit materials. Indeed, the assumption that children are only to be found around schools or at home is ludicrous in today's society, and it is questionable that it even had much validity in less "sophisticated" times than these. Nor would it help to place the racks in a less frequented area or in an area frequented by those who like adult-oriented materials. Today's children, at least in California, are very mobile. The less frequented the area is, the more anonymous these already very anonymous purchases can become. For a child, who might not want to be seen by another's prying eyes, the publications would become even more attractive if they were away from ordinary neighborhoods and school zones. In that regard, it is interesting to note that the California legislature was aware of an instance where a geographic restriction was attempted by a California city. The city's attempt failed in part because, as a California Court of Appeal said:
 
 
 33
 Additionally, the relationship between the ordinance and the asserted governmental interest is so tenuous as to fall short of constitutional sufficiency.... The ordinance merely moves the newsracks away from residential areas. Any determined teenager can seek out the relocated newsracks. As Sebago points out, it is just as likely, if not more likely, that a minor will purchase an adult newspaper from a newsrack far away from the watchful eyes of parents and neighbors.
 
 
 34
 Sebago, 211 Cal.App.3d at 1386, 259 Cal.Rptr. at 925 (citation omitted).
 
 
 35
 No doubt the legislature relied upon that wise analysis.[5] We do too, but we add one further note. This is not a method of purveyance where only "a few of the most enterprising and disobedient young people" can break through some sophisticated electronic system designed to exclude them. Cf. Sable Communications, 492 U.S. at 130, 109 S.Ct. at 2839; see also Denver Area, --- U.S. at ----, 116 S.Ct. at 2393. Any youth with a few coins can access the materials in question.
 
 
 36
 Moreover, the statute is not prohibitively invasive of any adult's interest in obtaining the materials. The statute provides two defenses which allow for the retention of newsracks; and, although those defenses may impose some economic burden, they do enable the publishers to continue distributing their publications on streets. Also, the publications can be made available through other distributors if the price and salability of the publications make them profitable. See Denver Area, --- U.S. at ----, 116 S.Ct. at 2387 (Breyer, J. writing for plurality). If, as Crawford suggests, merchants do not wish to carry these materials, that is no fault or business of the State. See id. at ---, 116 S.Ct. at 2383 (Breyer, J. writing for plurality); City of Renton, 475 U.S. at 54, 106 S.Ct. at 932 (the fact that purveyors of materials must "fend for themselves" does not raise a First Amendment problem). Furthermore, the parties stipulated that adult-oriented publications of a similar ilk are readily available to adults in libraries and other easily accessed locations.
 
 
 37
 The harm in question here is obvious, and Crawford points to no other viable method to avoid it. Given Crawford's interest in suggesting other possibilities and the fact that we cannot imagine others ourselves, we are satisfied that the statute is narrowly tailored to protect children without depriving adults.[6]
 
 II. The Preliminary Injunction
 
 38
 Lungren argues that the district court erred when it ordered the California Attorney General to immediately notify all district attorneys and sheriffs to obey the preliminary injunction which it had issued. The injunction did not name them, but the court decided that they were required to obey it anyway and that Lungren had authority over them. Lungren asserts that the district court erred because the Attorney General lacked the power to direct local officials to obey the order. We, however, lack the authority to make that determination because the preliminary injunction is no longer in force. We can offer no remedy; the issue is moot. See American Casualty Co. v. Baker, 22 F.3d 880, 895-96 (9th Cir.1994) (an appeal is moot if the court cannot fashion any type of effective relief).
 
 CONCLUSION
 
 39
 We came upon this case at the confluence of two streams of concern which flow through our polity--our concern for the protection of our First Amendment freedoms and our concern for the protection of our children. At such a confluence, we expect to hear a roar rather than a purr. So it is here. But although the confluence may be roily, the answers to the issues presented by this case are not wholly obscure.
 
 
 40
 The State's compelling need to protect children from these publications has been satisfied by the use of a statute which accomplishes the purpose with a precision that protects our First Amendment interests. Neither concern has been sacrificed to the needs of the other. In fine, the statute withstands the attacks made upon it today.
 
 
 41
 AFFIRMED.
 
 TASHIMA, Circuit Judge, concurring:
 
 42
 I concur in the result and concur generally in the reasoning employed to reach it. I write separately only to add one observation. In the sensitive area of First Amendment strict scrutiny, contrary to the teaching of all conventional wisdom on the scope of judicial review, judges sometimes are required to rely "on their own instinct or experience," Geary v. Renne, 911 F.2d 280, 305 (9th Cir.1990) (en banc) (Rymer, J., dissenting), vacated and remanded, 501 U.S. 312, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991), in making that strict scrutiny analysis. This is such a case.
 
 
 43
 As our opinion points out, the law does not require, and this record does not provide, any evidence that less restrictive means are unavailable to meet the perceived problem of newsrack purchases of adult literature by minors. Thus, our judgment that no less restrictive means is available to achieve that compelling interest, despite the absence of any evidence in the record to support that "finding," is truly instinctive and experiential. We acknowledge as much by our references to our own judgment on this score as "common sense" or "a value judgment" or as compelled because "we cannot imagine" otherwise.
 
 
 44
 I hesitate to add, however, that legislatures should be mindful that they ought not be content always to rely on the instinct and experience of judges to come to the same conclusions as they have in the absence of any legislative record.
 
 
 
 *
 The Honorable Robert R. Merhige, Jr., Senior United States District Judge for the Eastern District of Virginia, sitting by designation
 
 
 [1]
 Those defenses are described in Cal.Penal Code § 313.1(h) as follows:
 It shall be a defense in any prosecution for a violation of paragraph (2) of subdivision (c) that the defendant has taken either of the following measures to restrict access to the harmful matter by persons under 18 years of age:
 (1) Required the person receiving the harmful matter to use an authorized access or identification card to the vending machine after taking reasonable measures to ascertain that the applicant was 18 years of age or older and has established a procedure to immediately cancel the card of any person after receiving notice, in writing or by telephone, that the code has been lost, stolen, or used by persons under the age of 18 years or that the card is no longer desired.
 (2) Required the person receiving the harmful matter to use a token in order to utilize the vending machine after taking reasonable measures to ascertain that the person was 18 years of age or older.
 
 
 [2]
 They will be collectively referred to as Crawford
 
 
 [3]
 They did not challenge the definition of "harmful matter" in § 313(a) nor did they assert that their publications are not harmful matter. The publications in question do contain a large quantity of highly sexually oriented pictorial and written matter which is not, however, obscene. We will sometimes refer to them as adult-oriented
 
 
 [4]
 Those sued and restrained were Daniel E. Lungren, the Attorney General of the State of California, and a number of officials of local California entities. They are collectively referred to as Lungren
 
 
 [5]
 No doubt the legislature also recognized that the analysis was suggested by a plaintiff, who wished to have the ordinance stricken. Interestingly enough, plaintiffs in this case raise the geographical issue as a method of striking this legislation, but for the opposite reason
 
 
 [6]
 Crawford additionally argues that the statute violates the First Amendment because it lacks a requirement that the seller have knowledge that the materials sold are "harmful." However, this ground was not argued to the district court. We decline Crawford's invitation to consider the argument for the first time on appeal. See International Union of Bricklayers & Allied Craftsman Local Union No. 20 v. Martin Jaska, Inc., 752 F.2d 1401, 1404 (9th Cir.1985) (court will not review issue not raised in district court except in special circumstances such as to prevent manifest injustice). For the same reason, we decline to consider Crawford's equal protection and due process claims. Although the complaint made a passing reference to those claims, the argument is newly minted. The district court is not merely a way station through which parties pass by arguing one issue while holding back a host of others for appeal