**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FREDERICK K. C. PRICE,
            *Plaintiff-Appellant,*

v.

JOHN STOSSEL, an individual;
GLENN RUPPEL, an individual;
AMERICAN BROADCASTING
COMPANIES, INC., a Delaware
corporation; TRINITY FOUNDATION,
INC., an entity, form unknown;
OLE ANTHONY, an individual,
            *Defendants-Appellees.*

No. 09-55087

D.C. No.
2:08-cv-03936-
RGK-FFM

OPINION

Appeal from the United States District Court
for the Central District of California
R. Gary Klausner, District Judge, Presiding

Argued and Submitted
February 2, 2010—Pasadena, California

Filed August 24, 2010

Before: Mary M. Schroeder, Raymond C. Fisher and
N. Randy Smith, Circuit Judges.

Opinion by Judge Schroeder

12685

**COUNSEL**

Anthony Michael Glassman (argued), Richelle Kemler, Glassman, Browning, Saltsman and Jacobs, Inc., Beverly Hills, California, and Robert A Olson, Greines, Martin, Stein & Richland, LLP, Los Angeles, California, for plaintiff-appellant Frederick K.C. Price.

Andrew M. White, White O'Connor Fink & Brenner LLP, Los Angeles, California (argued for defendants-appellees), David E. Fink, White O'Connor Fink & Brenner LLP, Los Angeles, California, Allison S. Brehm, White O'Connor Fink & Brenner LLP, Los Angeles, California, Tami Kameda, White O'Connor Fink & Brenner LLP, Los Angeles, California, for defendants-appellees John Stossel, Glenn Ruppel, and American Broadcasting Companies, Inc.

William E. Pallares, Lewis Brisbois Bisgaard & Smith, LLP, Los Angeles, California, for defendants-appellees Trinity Foundation, Inc. and Ole Anthony.

**OPINION**

SCHROEDER, Circuit Judge:

Journalists and publishers risk a defamation action when they put words in a public figure's mouth. The New Yorker magazine learned this to its chagrin in *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991). The issue in this case is whether there are similar risks when a network television program broadcasts a statement actually made by a public figure, but presents the statement in a misleading context, thereby changing the viewer's understanding of the speaker's words.

The plaintiff public figure in this case is Dr. Frederick Price, a minister known for his television evangelism. Defendants are American Broadcasting Companies, Inc. ("ABC") and others involved in the production of the news program "20/20," including correspondent John Stossel, producer Glenn Ruppel, and televangelist critics Ole Anthony and Trinity Foundation, Inc., who allegedly provided the original footage of Price to the network. The primary statement in question comes from a film clip ("the Clip") of Price delivering a sermon, in which Price says: "I live in a 25-room mansion. I have my own $6 million yacht. I have my own private jet, and I have my own helicopter, and I have seven luxury automobiles." ABC broadcast the Clip suggesting that Price was boasting about his own wealth, which is substantial. In fact, however, the Clip was excerpted from part of a longer sermon in which Price was speaking from the perspective of a hypothetical person who, though wealthy, was spiritually unfulfilled. After ABC broadcast a retraction acknowledging the mistake, this lawsuit ensued.

The district court dismissed Price's defamation action as frivolous under California's anti-Strategic Lawsuit Against Public Participation ("anti-SLAPP") statute, California Code of Civil Procedure § 425.16(b)(1), which provides for early dismissal of suits that threaten defendants' right of expression under the First Amendment. The district court concluded that Price could not prove that Defendants' broadcast of the Clip was "false" within the meaning of defamation law, because the plaintiff had elsewhere made similar statements about his own wealth.

We conclude, for the reasons explained more fully below, that the district court's dismissal of the suit under the anti-SLAPP statute was premature. The district court erroneously compared the statements in the Clip with Price's actual wealth and possessions, agreeing with Defendants that the Clip was "substantially true." Under *Masson*, however, when dealing with material that is portrayed as a quotation, we are to com-

pare the quotation as published with the words the speaker actually said. *See* 501 U.S. at 502. Where the published quotation contains a material alteration of the meaning conveyed by the speaker, the published quotation is false. *Id.* at 517. Here, the context in which Price's words were presented materially changed the words' meaning. Because Price has a reasonable possibility of proving that the Clip, as broadcast, was false, and because Defendants relied exclusively on the issue of non-falsity in their motion to dismiss under the anti-SLAPP statute, we must reverse the dismissal of the express defamation claim and remand. We express no opinion as to whether Price can satisfy the remaining elements of a defamation claim or whether there were any damages. We affirm the district court's dismissal of Price's implied defamation claims.

## FACTUAL BACKGROUND

In 1973, Price founded the Crenshaw Christian Center/Ever Increasing Faith Ministry ("the Church"), which presently claims a congregation of over 22,000 members. For decades, Price has televised his sermons through his "Ever Increasing Faith" television programs. Price preaches a theology known as the "prosperity gospel," which emphasizes God's generosity, particularly financial generosity, and the ability of believers to claim that generosity for themselves.

As a self-proclaimed "prophet of prosperity," Price touts his own prosperity in his preaching, books, audio recordings, and public statements. Price is indeed wealthy. The undisputed evidence establishes that Price owns an 8,000 square foot house worth $4.6 million, travels around the world in a private Gulfstream jet owned by the Church, owns a Rolls Royce, wears an $8,500 watch, and serves as Chief Executive Officer of the Church, which Price describes as a $40 million corporation.

On March 23, 2007, ABC broadcast a program entitled "Enough" on its news show "20/20." The program, hosted by

ABC news correspondent John Stossel, featured seven individuals who had taken personal, moral stances on a variety of topics, including children's behavior in restaurants, the price of basketball shoes, politicians' practice of naming buildings after themselves, children born out of wedlock, earmarks for local interests, and treatment of animals by law enforcement. The portion of the program at issue in this case was a report on wealthy preachers, as investigated by a non-profit watchdog group dedicated to improving the transparency and accountability of Christian ministries. ABC promoted the report using teasers and a mini-report on "Good Morning America," which included excerpts of the full-length report as well as silent footage from the Clip of Price's sermon, with voice-overs by news presenters pitching the report. It is the contents of the report, mini-report, and teasers that give rise to Price's defamation action.

The following is a narrative of the seven-minute report, drawn largely from the district court's description. The Clip at issue is emphasized:

> The report begins with a question posed by Stossel: "They preach the gospel of giving to God. But how much of what you give do they keep for themselves? Is it time for someone to say 'enough'?" Stossel then states, "[m]aybe they will do great things with your money." Subsequently, the report shows audiovisual clips of several ministers, not including Price.
>
> The report then turns to a brief interview with a member of Price's congregation, who states that she believes her "money is being put to excellent use, without one question." *Stossel continues, "[a]nd yet her pastor, Fred Price, boasts that . . . [cutting to an audio-visual clip of Plaintiff]: 'I live in a 25-room mansion. I have my own $6 million yacht. I have my own private jet, and I have my own helicopter, and I have seven luxury automobiles.' "* Stossel states,

"At least he tells people about it, but many preachers don't advertise how well they live." The report then runs video clips of other ministers who are identified as less forthcoming about their wealth. Stossel explains that some of these other ministers "point out that they comply with all IRS regulations." The report then turns to the featured guest, who states that complying with all IRS regulations is "not good enough."

The featured guest, Rusty Leonard, is the founder of Ministry Watch, an organization created to improve fiscal transparency of ministries and charities. Stossel presents him as "a deeply religious man who invests and lectures about investing in companies that he believes have Christian-friendly values." Stossel reports that Leonard left a lucrative Wall Street career "because he thought it was un-Christian [for ministers, including Price to] ask donors for money but [not] reveal how they spend it." During Stossel's voiceover, images of 10 different ministers flash across the screen. Price's image appears for approximately one second. Stossel then states, "[Leonard] says donors are being hosed." The report then cuts to Stossel interviewing Leonard. Stossel asks Leonard about how he knows donors are being hosed. Leonard states, "You're being hosed if you don't know."

Turning to a clip of a Ministry Watch employee, the report shows how Ministry Watch asks ministries to reveal their finances. A Ministry Watch employee is shown making a call in an office: "We sent you a letter a couple of weeks ago requesting your organization's latest 990," she says. Stossel explains, "They ask Christian ministries and charities to reveal their finances." Stossel asks Leonard: "So you call up and say, 'Hi, I'd like to know where your money's

going,' and they say, 'Go to Hell'?" Leonard laughs and answers, "Essentially. Especially the bad guys, right? Nobody had ever held them to account from an independent perspective, right? So they were totally freaked out by it." Stossel then remarks how some of the people have threatened to sue Leonard, to which Leonard responds: "Bring it on," and explains that all he gets are threats, not real lawsuits. Stossel then explains that "[w]hile most charities legally must report their finances, ministries are exempt."

Stossel reports that Ministry Watch has criticized approximately 28 religious groups for not revealing how they spend donations. At this point, an image of Ministry Watch's "Transparency List" flashes on the screen for approximately five seconds, showing the names of approximately 11 ministries, including Price's "Ever Increasing Faith" television ministry. Stossel then identifies specific ministers, not including Price, as televangelists whom Ministry Watch has criticized for being secretive and having little or no financial transparency. Leonard states that people should not donate to such ministries because they are not open about how they spend donations. Leonard also notes that the lack of openness "does not mean that [the ministries are] doing anything wrong," although it indicates a "very high probability that something is wrong there."

Leonard states that, as indicated on the website MinistryWatch.com, there are "good guys" (Shining Light Ministries) and "bad guys" (Donor Alerts) in the religious fundraising arena, and that there are "a lot more good guys than there are bad guys." Stossel reports Leonard's belief that "the vast majority" of ministries "do a good job and spend your money well." Stossel continues by stating that Leonard,

however, remains critical of televangelists who own multi-million dollar homes in gated communities and travel the world in multi-million dollar jets. Leonard states that the leadership of the ministries should, like Jesus, maintain some degree of sacrifice. Leonard then states that the ministers that he criticizes do "some good works, but they could spend a whole lot more money if they sold the house and the car and the jet plane." The report then discusses another televangelist, whose improved financial transparency earned praise from Leonard. The report ends with the conclusion of Leonard's interview.

Following ABC's broadcast of the report, Price demanded a retraction on the ground that the Clip, which suggested that Price was speaking about his own wealth, was taken out of context. In the actual sermon from which the Clip was excerpted, Price was telling a parable of unhappiness brought about by a lack of faith, and he was speaking from the perspective of a hypothetical man. In response, on May 11, 2007, ABC broadcast a retraction on "Good Morning America" and "20/20," and posted the retraction on its website. The retraction, narrated by John Stossel, aired as follows:

Now I want to correct a mistake we made. Several weeks ago, in a story about the financial openness of Christian ministries, we heard this clip of televangelist Frederick Price.

[Replay of the Clip.]

We thought Dr. Price, founder of Crenshaw Christian Center, was talking about himself, but we later learned he was preaching a sermon about a hypothetical person who had many material possessions but lived a spiritually unfulfilled life. We'd used his quote out of context, and for that, we apologize to Dr. Price and the Crenshaw Christian Center. And

we apologize to you if we misled you. Also, the Center sent us a statement saying Dr. Price is paid, quote, "a salary commensurate with his duties" and that the church, quote, "openly shares its financial information with its congregation."

This litigation followed.

## PROCEDURAL HISTORY

Price first filed a defamation action against Defendants in Los Angeles County Superior Court in July 2007. Defendants removed to federal court on the basis of diversity jurisdiction. The parties then agreed to dismissal of the complaint without prejudice in an attempt to resolve the dispute through mediation. When mediation failed, Price filed the complaint again, this time in the United States District Court for the Southern District of New York. Defendants moved for a change of venue, claiming that Price had filed in New York in an attempt to avoid California's anti-SLAPP statute. The New York court granted Defendants' motion, citing "Price's apparent — albeit unsuccessful — forum shopping," and transferred the action back to the Central District of California. Price's amended complaint alleged defamation and intentional infliction of emotional distress, and sought compensatory, general, and punitive damages.

Once the case returned to California, Defendants moved to strike the amended complaint under the anti-SLAPP statute. Under California law, defamation "involves the intentional publication of a statement of fact which is false, unprivileged, and has a natural tendency to injure or which causes special damage." *Gilbert v. Sykes*, 53 Cal. Rptr. 3d 752, 764 (Ct. App. 2007) (internal quotation marks omitted). Defendants' motion to strike addressed only falsity. Defendants' motion argued that the broadcast Clip was not false, and that the suit should therefore be dismissed. Defendants explicitly reserved their right to challenge the remaining elements of Price's def-

amation claim, such as actual malice and special damages, at a later stage in the proceedings.

Defendants' motion was limited to falsity for tactical reasons apparent from the district court's earlier published opinion on discovery. *See Price v. Stossel*, 590 F. Supp. 2d 1262 (C.D. Cal. 2008). Under California law, discovery is automatically stayed when a defendant files an anti-SLAPP motion, unless the opposing party can demonstrate "good cause." Cal. Civ. Proc. Code § 425.16(g). Price had sought discovery on intent, but after Defendants gave notice they would file an anti-SLAPP motion, the district court denied Price's motion to compel discovery, ruling that Price failed to show good cause because ABC's intent was irrelevant to the anti-SLAPP motion's narrow focus on falsity. *Price*, 590 F. Supp 2d at 1270-71. Defendants' focus on falsity thus avoided discovery as to their intent when they broadcast the Clip.

A few months later, the district court granted Defendants' anti-SLAPP motion, concluding that Price could not establish a probability that he would prevail on his claims because he would not be able to establish falsity. The district court compared the assets listed in the Clip (a 25-room mansion, a $6 million yacht, a private jet, a helicopter, and seven luxury automobiles) with assets that Price actually enjoys, and concluded that the allegedly defamatory Clip was "substantially true." The district court also dismissed the claim that the report implied criminal misconduct.

Price now appeals to this court. We have jurisdiction under 28 U.S.C. § 1291. We review de novo a district court's decision to grant a motion to strike under California's anti-SLAPP statute. *Vess v. Ciba-Geigy Corp., USA*, 317 F.3d 1097, 1102 (9th Cir. 2003).

## DISCUSSION

### I. California's Anti-SLAPP Statute

**[1]** California's anti-SLAPP statute permits courts at an early stage to dismiss meritless defamation cases "aimed at chilling expression through costly, time-consuming litigation." *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 839 (9th Cir. 2001). The statute was passed in 1993 in response to the legislature's concern that strategic defamation lawsuits were deterring citizens from exercising their political and legal rights. *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 970 (9th Cir. 1999) (citing *Wilcox v. Superior Court*, 33 Cal. Rptr. 2d 446 (Ct. App. 1994)). We have repeatedly held that California's anti-SLAPP statute can be invoked by defendants who are in federal court on the basis of diversity jurisdiction. *See Vess*, 317 F.3d at 1109; *Newsham*, 190 F.3d at 970-73. "The hallmark of a SLAPP suit is that it lacks merit, and [that it] is brought with the goals of obtaining an economic advantage over a citizen party by increasing the cost of litigation to the point that the citizen party's case will be weakened or abandoned . . . ." *Newsham,* 190 F.3d at 970-71. The anti-SLAPP statute attempts to counteract the chilling effect of strategic suits by providing that such suits should be dismissed under a special "motion to strike." Cal. Civ. Proc. Code § 425.16(b)(1). The statute provides:

> A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.

*Id.*

The parties in this case do not dispute that this action arises from an act in furtherance of free speech in connection with a public issue; the report was broadcast on national television and featured issues of widespread public interest. For a plaintiff to establish a probability of prevailing on a claim, he must satisfy a standard comparable to that used on a motion for judgment as a matter of law. *Metabolife*, 264 F.3d at 840. The plaintiff "must demonstrate that 'the complaint is legally sufficient and supported by a prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' " *Id.* (quoting *Wilcox*, 33 Cal. Rptr. 2d at 454). "[A] defendant's anti-SLAPP motion should be granted when a plaintiff presents an insufficient legal basis for the claims or when no evidence of sufficient substantiality exists to support a judgment for the plaintiff." *Id.* (internal quotation marks omitted).

## II.   Whether the Clip was False: Plaintiff's Express Defamation Claim

The only express defamation claim before us arises from ABC's use of the Clip, which was undisputedly broadcast out of context. Price contends that the district court erred in dismissing the express defamation claim under the anti-SLAPP statute because there is a reasonable probability that he will be able to prove that ABC broadcast a misleading and therefore false statement when it aired the Clip.

The district court characterized California law as holding that a statement is not "false" for purposes of a defamation suit if the statement is "substantially true," citing *Vogel v. Felice*, 26 Cal. Rptr. 3d 350, 361 (Ct. App. 2005) (citing *Masson*, 501 U.S. at 516-17). It explained, citing *Masson*, that "[a]n inaccurate statement is considered substantially true if there is no difference in effect on the mind of the reader from that which the pleaded truth would have produced." The district court then found that Price "lives an uncommonly wealthy and luxurious material lifestyle," and concluded that

the Clip was therefore "substantially true" because it was more or less an accurate portrayal of Price's actual wealth. The court thus found it immaterial that the Clip portrayed Price as talking about himself when he was not. The district court also dismissed Price's contention that the Clip falsely conveyed to the viewer the impression that Price was boasting about his wealth. The court pointed to other public statements in which Price talked about his own material prosperity. The court implicitly acknowledged that the Clip itself, as broadcast, portrayed a false impression of what Price was saying.

All parties agree that the controlling authority with respect to falsity of quoted material is the Supreme Court's decision in *Masson*. *Masson* involved an article in The New Yorker magazine about a noted psychoanalyst, Jeffrey Masson, who was formerly affiliated with the Sigmund Freud Archives. 501 U.S. at 499-500. Masson sued the publisher of the magazine for printing extensive quotations of his remarks that painted him in a highly unflattering light. *Id.* at 500-01. The plaintiff claimed that he was misquoted, and that the misquotations were false enough to be defamatory. *Id.* at 499. The record contained more than 40 hours of the author's recorded interviews, which enabled the Court to compare what the plaintiff had actually said with the quotations printed. *Id.* at 502. There was material published in the article as quotations that contained statements Masson had not uttered. *Id.*

The Supreme Court took the case to decide what degree of falsity is required to prove "actual malice" for purposes of summary judgment on a defamation claim brought by a public figure. *Id.* at 499. To prove "actual malice," a plaintiff must prove the defendant knew the statement was false, or acted in reckless disregard of its falsity. *Id.* at 510. Thus, in *Masson*, the constitutional question of actual malice necessarily drew from common law concepts underlying liability, because the question was how inaccurate a published statement had to be for a plaintiff to create a triable issue of fact regarding both falsity and knowledge of that falsity. *Id.* at 513-18.

**[2]** *Masson* explained the common law principle that inaccuracies alone do not render a statement false if there remains "substantial truth" to what was said. *See id.* at 516. Citing California law, the Court said that "[m]inor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.' " *Id.* at 517 (quoting *Heuer v. Kee*, 59 P.2d 1063, 1064 (Cal. 1936)). The Supreme Court concluded that, when dealing with quotations, a minor alteration of the words does not make the quotation "false" unless the alteration changes the meaning in a material way. *Id.* at 517. The Court said that "deliberate alteration of the words uttered by a plaintiff does not equate with knowledge of falsity . . . unless the alteration results in a material change in the meaning conveyed by the statement." *Id.*

The problem for the defendants in *Masson* was that the author of the article had in several instances materially changed the meaning of the plaintiff's words when she quoted him. For example, the author quoted Masson as saying that his superiors at the archives regarded him as an "intellectual gigolo." *Id.* at 502. In fact, Masson simply said that they thought he was a "private asset but a public liability" and that he was much "too junior within the hierarchy of analysis, for these important training analysts to be caught dead with [him]." *Id.* at 503. The Supreme Court held that a reasonable jury could find a material difference between the fabricated quote and the actual one. *Id.* at 522. Likewise, the Supreme Court held that a jury could find that the author materially misrepresented Masson's words and tone in a fabricated quote about the potential impact of his new book. *Id.* at 524-25. The reporter quoted Masson as saying that his colleagues "will say that Masson is a great scholar, a major analyst—after Freud, . . . the greatest analyst who ever lived." *Id.* at 506. In fact, Masson described his intellectual isolation more than his superiority when he said that "finally . . . I realized, that I hold a position that no other analyst holds, including, alas, Freud." *Id.*

In concluding that a jury could find these published passages, among others, to be false, the Supreme Court emphasized the special qualities of quotations as a literary convention. *Id.* at 511-13. It explained that when an author chooses to use quotation marks, that choice signals to the reader that the author is attempting to represent what the speaker actually said, rather than paraphrasing or conveying the statement through an interpretive lens. *Id.* at 511. It also explained that, when quotations are used, loyalty to the speaker's intended meaning is more important than a precise reproduction of the words spoken. *Id.* at 514-17. The Court observed that extensive revisions to a quoted statement can result in no change to the overall meaning, whereas "an exact quotation out of context can distort meaning, although the speaker did use each reported word." *Id.* at 515.

The district court apparently considered the presentation of Price's remarks to be within the zone of alteration permitted by *Masson*. The district court relied on *Vogel*, a California case where a defamation action by a public figure was dismissed under the anti-SLAPP statute because the alleged defamatory statements were substantially true. *See Vogel v. Felice*, 26 Cal. Rptr. 3d 350 (Ct. App. 2005). The plaintiffs in *Vogel* were candidates for public office who challenged statements the defendant made about them on his public website. *Id.* at 353. The website accused one plaintiff of being a "Dead Beat Dad" who "owe[d] [his] [w]ife and kids thousands." *Id.* at 355. The plaintiff contended that the statement was "false in that I do not owe my wife and kids thousands." *Id.* The website accused the second plaintiff of being "Bankrupt, Drunk, & Chewin tobaccy." *Id.* at 355. That plaintiff denied that he presently chewed tobacco or that he was an "alcoholic." *Id.* The Court of Appeal ruled that the partial denials were inadequate to establish the statements were substantially false and hence the anti-SLAPP motion should have been granted. *Id.* at 362-65. The statements had to be regarded as substantially true. *Id.* at 362-63.

*Vogel*, like *Masson* and this case, involved comparing the allegedly defamatory statements with the "truth" as acknowledged by the public figure plaintiffs, in order to evaluate whether the differences between the two were material. The "truth" in *Vogel* was derived from the facts plaintiffs admitted. In contrast, the "truth" in *Masson* was what the plaintiff had actually said, because the claimed defamatory statements were published as quotations.

[3] The district court followed the California Court of Appeal in *Vogel* and compared the assets Price identified in the Clip with some facts Price had acknowledged about the assets he owned. That was error, because this case, like *Masson*, involves the truth or falsity of a quotation. In *Masson,* the Supreme Court compared the meaning of the material represented as quotations in the magazine article with the audio tapes of what Masson actually said in the author's interviews. Under *Masson*, the district court in this case should have compared the meaning conveyed by the Clip as broadcast with the meaning of Price's own words in the context of the sermon he actually delivered.

[4] Indeed, *Masson* commented upon the special nature of quotations as appearing more authoritative and credible than descriptive passages. 501 U.S. at 511-13. The Supreme Court observed that "[q]uotations allow the reader to form his or her own conclusions and to assess the conclusions of the author, instead of relying entirely upon the author's characterization of her subject." *Id.* at 511. Even if a fabricated quotation asserts something that is true as a factual matter, the fabrication may nonetheless "result in injury to reputation because the manner of expression or even the fact that the statement was made indicates a negative personal trait or an attitude the speaker does not hold." *Id.* These observations are particularly relevant here because Price's quotation was published using a medium in which the viewer actually sees and hears the plaintiff utter the words. *See generally White v. Fraternal Order of Police*, 909 F.2d 512, 526-27 (D.C. Cir. 1990) (sen-

sory impacts of television in comparison to printed word must be taken into account); *Info. Control Corp. v. Genesis One Computer Corp.*, 611 F.2d 781, 784 (9th Cir. 1980) (noting relevance of medium).

**[5]** Because under *Masson* the proper comparison is between the meaning of the quotation as published and the meaning of the words as uttered, we conclude that the video quotation of Price's statement materially changed the meaning of Price's words. Price did not make any representations about his own wealth when he delivered the sermon that was excerpted in the Clip. In the quote, as misrepresented by the Clip, Price is speaking about himself, whereas in the context of the actual sermon, Price is telling a story about someone entirely different.

**[6]** We therefore hold that the district court erred as a matter of law in dismissing Price's express defamation claim at this preliminary stage in the proceedings on the grounds of lack of falsity. Under controlling Supreme Court precedent on when journalists' misquotations of statements made by public figures are false for purposes of establishing actual malice, there is a substantial likelihood that Price can establish that the publication of the Clip was false. Hence we reverse the district court's dismissal under the anti-SLAPP statute.

In so holding, we emphasize the narrow question presented to this court: whether Price can probably prove that the Clip, as broadcast, was false. We express no opinion as to whether Price, on remand, will be able to meet his burden to show a probability of prevailing on the other elements of his express defamation claim, including damages and intent.

## III.  Implied Defamation

Price contends the district court erred in dismissing his claims of implied defamation. Independent of the alleged misrepresentations in the Clip, Price claims that the report

implied (1) that he engaged in criminal and/or dishonest conduct; and (2) that he lacks transparency in his Church dealings.

**[7]** California law recognizes that a defamatory statement can be "expressly stated or implied." *Forsher v. Bugliosi*, 608 P.2d 716, 721 (Cal. 1980). "If the defendant juxtaposes a series of facts so as to imply a defamatory connection between them, or otherwise creates a defamatory implication, he may be held responsible for the defamatory implication, even though the particular facts are correct." *Weller v. Am. Broad. Co.*, 283 Cal. Rptr. 644, 652 n.10 (Ct. App. 1991) (quoting Prosser, The Law of Torts § 116 (5th ed. Supp. 1988)) (internal alterations omitted). To state a claim for implied defamation, however, the published statement must reasonably "be understood as implying the alleged defamatory content." *Id.* at 651 n.8. This threshold requirement, derived from the common law, is independent of any constitutional requirements that would otherwise protect speech. *Id.*

The district court found that it could not reasonably conclude that the broadcast implied criminal wrongdoing by Price. The district court accurately explained, "[n]owhere in the ABC Broadcasts is there even the slightest indication that Plaintiff is either accused, or guilty, of criminal wrongdoing. In fact, in its only mention of the law, the Report makes clear that religious organizations such as Plaintiff's are *not* legally required to provide a financial accounting."

**[8]** Price contends that the district court erred because John Stossel's exclamations of "Enough!" and the statement that "Stossel . . . is 'taking on the case' " somehow suggest a "criminal proceeding or something that deserves to be one." We disagree. The broadcast was intended to be a public exposé of questionable, self-serving conduct on the part of ministers, but there was no direct statement or suggestion that a criminal proceeding had been or should be instituted. The broadcast does suggest people should not continue to give

money, but we agree with the district court that it would be unreasonable to infer allegations of criminal wrongdoing from the statements identified by Price, or elsewhere in the broadcast and teasers. The statement that John Stossel is "taking on the case," reasonably refers to an investigative television news reporter, not a prosecutor. The statement thus indicates that he is taking on a newsworthy issue, not exposing a crime.

Both parties rely on the California Court of Appeal's decision in *Weller* for support, but it favors Defendants. In *Weller*, an antique dealer sued ABC for a broadcast that implied he had sold a stolen candelabra to the de Young Museum. 283 Cal. Rptr. at 647-48. The broadcast at issue in *Weller* connected the plaintiff to a convicted felon, described the plaintiff as "reportedly" out of town during the criminal investigation, credited a witness who identified the candelabra as stolen, and asserted that the plaintiff refused to disclose the source of the candelabra. *Id.* at 651. The Court of Appeal determined that this series of facts could reasonably be understood to imply that the plaintiff had dealt in stolen goods. *Id.*

**[9]** The facts in this case do not approximate those in *Weller*, as ABC's broadcast in this case did not discuss any identifiable crime, and in fact stressed the lack of legal constraints on the ministries highlighted in the report. Price cannot meet his burden to show probable success in proving the report fairly implied criminal conduct under California law, and the district court therefore correctly dismissed that implied defamation claim.

Price also contends that even if the broadcast did not imply accusations of criminal behavior, it nonetheless implied accusations that Price was dishonest. The district court found that the remaining implications alleged by Price were too vague to constitute actionable defamation. We agree. *Cf. Underwager v. Channel 9 Australia*, 69 F.3d 361, 367 (9th Cir. 1995).

Finally, with respect to Price's additional contention on appeal that the broadcast implied that he lacks transparency in

his Church dealings, Price cites to references in the Clip and Leonard's inclusion of Price's ministry as one of the "bad guys" on Ministry Watch's "Transparency List." Because this argument was not developed in the district court, the district court did not expressly decide an implied defamation claim for lack of transparency. We can therefore deem it waived. *See Crawford v. Lungren*, 96 F.3d 380, 389 n.6 (9th Cir. 1996). Nevertheless, even if we were to consider Price's transparency claim as presented for the first time on appeal, we would conclude that it should have been dismissed under the anti-SLAPP statute along with the other implied defamation claims.

The factual basis for the conclusion that Price's ministry lacked transparency was shown to viewers, and a speaker who outlines the factual basis for his conclusion is protected by the First Amendment. *Gardner v. Martino*, 563 F.3d 981, 987 (9th Cir. 2009); *Partington v. Bugliosi*, 56 F.3d 1147, 1156-62 (9th Cir. 1995). The report showed footage of a Ministry Watch employee calling an unspecified ministry to ask for disclosure of tax filings, and broadcast Leonard's explanation that the "bad guys" are those ministries that refuse to accede to the organization's requests for voluntary disclosure. A reasonable viewer may or may not agree with Leonard that ministries should disclose their financial data whenever a watchdog organization asks them for it. The viewer knows, however, that a ministry's negative response will land it on the organization's "bad guys" list and that Price and his Church are on it. The report's criticism that Price and his Church lack transparency is therefore supported by a disclosed factual basis, and cannot provide grounds for a successful defamation suit.

**[10]** In sum, because it is unlikely that Price could prevail on his implied defamation claims, the district court correctly dismissed them under the anti-SLAPP statute.

## CONCLUSION

For the foregoing reasons, we reverse the district court's dismissal of the express defamation claim under the anti-SLAPP statute, and remand for further proceedings. We affirm the district court's dismissal of the implied defamation claims. The parties shall bear their own costs on appeal.

**REVERSED IN PART, AFFIRMED IN PART, AND REMANDED.**